Next case is also BET Technology versus Facebook, Google, at Aisle 15. This is the 1829 case, Mr. Freitas, again. And we'll be focusing on Shaw and other references. Yes, Your Honor. Thank you. May it please the Court. I'd like to begin this argument with a focus on the disclosure regarding real time. In column 16 of the 314 patent, all this information is in the original application. There's a clear discussion of how it all works. It begins by saying, as will be appreciated by those skilled in the art, the reactive targeting provided by client software application 10 is handled in real time rather than simply as a part of building a set of advertisements for later display to the user. So there's a clear distinction there between real time and building ads for later. It goes on. This permits the display of advertising that is relevant to what the user is doing at any particular time. The key concept involved in real time, what the user is doing at the particular time. It goes on with an explanation regarding stocks. Then, moving on, there's a very, very clear disclosure of grabbing an ad from the Internet, not just in local storage. On line 40, excuse me, starting on 38, furthermore, for user computers that enjoy a full time connection to the Internet, the reactive targeting can be used to access a specific advertisement over the Internet rather than from a pre-stored Banner storage. And that thought is followed up on a few lines down. Line 45, alternatively, the user's actions that can be used to select an advertisement via Banner database 130 can be sent to ADM server 22 or some other advertising server as posted form data with the server using the data to select and download an appropriate advertisement. This permits real time targeting of advertising while expanding the available pool of advertisements without having to previously download. So it's quite clear what's going on there in the real time. The point we were criticized on by the board, and this is the only point that was made, was that it wasn't clear whether it was the selection or the transfer that had to occur in real time. But what's there in the disclosure? Well, first of all, obviously the display is there. It's there in black and white. The selection and download are also spelled out in black and white. But there's another way to think about this. Obviously, the point is to display to the user something that relates to what he or she is doing at that time. Well, in order to do that, there obviously has to be a selection. And if, as in the column 16 disclosure, the ad is being retrieved from the Internet, well, it's being selected for transfer. And this is all occurring in real time, and it's quite clear. And that's where we were criticized. We didn't say whether it was selection or transfer. Well, there's no need to say that. It's spelled out quite clearly in our written description support. But let me go back to the issue about the unique identifier and the unique way that that's addressed in the Facebook case. Interestingly, what Facebook has done is criticize us for not looking at the words set over said computer network when we focused on set from the computer. Well, what we tried to explain in our reply brief, that's common ground. The unique identifier must identify information set over the computer network. We agree with Facebook. But where we apparently part company is whether the rest of the claim language is just as important. And we say it is. We say those are words of limitation. They apparently disagree. With respect to Shaw, the Shaw email address, again, is a user identifier. It does not identify what comes from the computer. It identifies what comes from the user. And like the other items that have been argued and found by the board to meet this limitation, the Shaw email address also fails. Interestingly, in its decision, the board said Claim 11 only requires that information is identified by the identifier and said that we did not provide persuasive evidence that the information must be the computer itself. We sure didn't because we never argued that. That is the straw person that the board took aim at. The board said that we didn't prove that the information must be the computer. We never said anything remotely like that. So you've just described what your argument is not. Can you repeat what your argument is and then tell me what the daylight is between your argument versus the argument that is not your argument? Yes, Your Honor. Our argument, very simply, is that as the language said and as all agree, it is information that is being identified. Which information is it? It is the information sent over said computer network from the computer, is the key point of dispute, to said server. The from the computer point does not, in our mind, signify that the identifier must per se identify the computer. And there are two examples in column 17. Okay, so then what is it? It must show, it must identify the information that comes from the computer, that is sent from the computer. And there are two examples in column 17 in the patent of how that could be the case. And by the way, there's no doubt that throughout the patent there is a reference to user IDs. That's true. But in column 17, where these two key disclosures are made, they're talking about a user ID, but they're talking about a user ID, first, being provided to the particular piece of software that's on the computer, and second, using a cookie. Now in these examples, Judge Chen, what we see is something that goes beyond merely identifying a user. The user ID, the unique identifier, whatever type of identifier it is, when it is provided to the software on a particular computer, it doesn't say Joe's computer or Sally's computer. What it says is, all right, this identifier identifies this piece of software. That piece of software resides on a specific computer. Therefore, that identifier is capable of meeting the limitation. The Shaw email address doesn't have that characteristic. It can't do that. All it does is say this information came from that user who has that email address. The same thing with the cookie. The cookie is provided to the computer. When the ID is associated with the cookie, the information that goes with the cookie is uniquely identified as coming from that computer, although it isn't per se an identifier of the computer. But it serves the function, it serves the purpose of the limitation because it now does identify what comes from the computer. I believe this is the appeal where your opposing counsel is arguing that your claim as proposed to be amended doesn't have an inventive concept and therefore is no good under Section 101. Yes, Your Honor. What's your response to that? Our response to that is that as the art was developing at this time, a lot of techniques were known. Certainly the idea of using demographic information in the abstract, that's something that was well known. But as the Internet was growing, there was something that was very different that was coming around, and that was the ability to use this reactive targeting and to do so in real time. This is not something that ties back to anything that could have happened before. It's very unique and specific to what was going on as the Internet was developing. So your inventive concept is to display ads in real time based on what the user happens to be browsing at that time? It is an inventive concept. It is the use of computer usage information for that purpose. The use of the computer usage information in the targeting. But beyond that, the rest of the 314 patent is addressing other new ideas involving the use of the new technology that was now available. And the art that's been cited doesn't demonstrate that the inventive steps that are in Claim 11 were old. I have another point to make about the specific reference to W3C. Facebook seeks, in some sense, to combine the identifier of Shaw. I'm sorry, don't we have an opinion that says targeted advertising is an abstract idea? I don't remember that one, but in general, Your Honor, I think it is. Okay. So in the abstract, targeted advertising, the idea of targeting advertising, yes, that's abstract. But we go beyond that. We use specific features to do specific kinds of targeting. And these are tied to the new developments that were then available in the Internet. You're into your rebuttal time, but you wanted to make a point about W3C. Yes, I would like to make one point about W3C before I sit down. On page 8 of 13 of the W3C reference, there is a clear distinction between the identifier as claimed in Claim 11 and the identifier as used in W3C. What it says is that identity is often tied to a user's client machine through site-specific cookies. This creates an unnecessary and inconvenient dependency since users frequently move from machine to machine. And then it offers some solutions. And what the W3C proposal does, among other things, is it removes that cookie dependency, which creates the machine dependency, which matches up with Claim 11. So the Shaw email address is not the Claim 11 identifier. And the problem is not solved by W3C. Ms. Keefe. Thank you, Your Honors. I'd like to start where Mr. Freitas took off, and he just said that what we have to look for are somehow now cookies, even though they are nowhere in the claims themselves. But luckily, we have a record in which there is a combination where none of the items are disputed. We haven't heard about that today because they have no good answer for it. Engels plus Shaw. It's undisputed that the Engels plus Shaw combination includes all of the elements of the claims. And in fact, the Engels reference specifically talks about using cookies with the identifier in order to send information to and from the computer. The only argument that a patent owner has made of any form versus the Engels and Shaw combination is somehow that the motivation to combine didn't exist. But the problem is the Board actually pointed out that there was a very specific reason for combining Engels and Shaw, and that would be, and this is at A22, that the combination would result in reduced costs and increased efficiencies. And they come to this conclusion right after citing two portions of the petition, which indicated that the combination of Engels and Shaw would result in the claimed invention. And at page 42 of the petition, which is at A1623, specifically column 12 of the patent is pointed out as supporting that it would be a good idea in order to increase efficiency to store the advertisement locally so that you could access it more quickly. Column 12 of Engels specifically contemplates that you would want to store information locally in order to access it more quickly. And that's at A1701. Therefore, the examiner had sufficient evidence in the record to easily conclude that the combination was correct. But here we have an even more interesting scenario in which BE itself has conceded that the combination is proper because of the increase in speed. So here in the record itself, BE concedes that it would be faster to be able to access local storage of advertisement. They do so at A2510, which is in their brief down below. And they also do so in their brief here above at pages 35 through 36, where they indicate that storage of advertisements on the advertising storage medium on the consumer computer would provide for faster access to the stored advertisements, thereby providing the proper motivation for someone using Engels to look to Shaw to see how that might be done. Their only argument is that wouldn't dispense with the need for commands from the advertising computer or eliminate the need for online communication. But that's not required for there to be a motivation to combine, solely that you would look to the combination in order to find something and some reason to combine the references. And here, that's absolutely true. And there's no argument that there is not a unique identifier in the Engels and Shaw combination. With respect to Your Honor's question regarding the 101, I think it's very important to point out that early in the argument today, Mr. Freitas indicated that, in fact, the proposed amendment includes broad claim language. You can use it in any way and in any combination you want. So saying that this is, in fact, very, very broad. He then concedes that, in fact, targeted advertising is generic and says that the only thing that might be somehow new is the idea of real time. However, in terms of real life analogies, real time targeting of advertisements have been used for centuries, including, for example, walking around Times Square noticing that someone has kids with them and giving them in real time a pamphlet for The Lion King instead of for some more serious play. That's a targeted advertising happening in real time. But the patent itself also gives us the possibility of real time access to information. If we look to column three, which is at A1118, in describing the bland patent, they specifically indicate that information may be given periodically, and this is at line six, or in response to a specific request by the servers. That's something that could be happening in real time. So there's nothing saying that real time wasn't actually in the prior art itself, just that perhaps it wasn't used when you used the combination. But the rest of the specification in columns one, two, and three fully embrace the notion that targeted advertising based on usage data, based on demographics, is, in fact, generic and is old. Your Honors do actually have recently had a case directly in front of you. Are you equating generic with old and abstract? They're not necessarily the same thing. They can be the same thing. Here the generic idea is simply that of targeting information based on demographics or targeting information based on usage data. And the question is whether that would be abstract. And I think that is absolutely abstract. In fact, Your Honors recently had a case in front of you, the Morsa versus Facebook case, where the exact issue was targeting advertisements based on demographics. And in that case, there was a Rule 36 affirmance of a 101 rejection. Your Honors also recently had in front of you the Baskin case, where Your Honors found that the filtering of information is, in fact, generic. In that case, you were filtering information the opposite direction. You were trying to find out what not to serve instead of what to serve. But the fact remains that filtering information from a server down to a user is, in itself, generic. Those two very recent cases, I think, are on point for that point. And with that, Your Honors, unless you have any further questions, I think there is sufficient evidence to find that, in fact, the rejection of the original claims was proper over the combination of Engels and Shaw and that the 101 rejection is also proper to sustain the rejection of the claim amendment. And under Rexnord, since it is another ground that was fully briefed below, it's appropriate to use it here to sustain the rejection. Thank you, Your Honors. Thank you, Ms. Keefe. Mr. Freitas has two and a half minutes. I don't think Ms. Keefe is correct about the cookie playing a role in what the Board did with Engels. I've just taken a quick look. I didn't remember the Board relied on that, and I don't see it in my review. What the Board relied on, what the Board cited, was the consumer member code. It's also a user ID, not a Claim 11 unique identifier. With respect to the idea of a motivation to combine, the evidence that was presented made it clear that these two systems are different. One way that Facebook attempted to equate them and to substantiate the idea of a motivation to combine was by saying that, well, it could be used with the Internet. It didn't require, excuse me, it could be used with a dial-up. It didn't require a continuous connection. But it's quite clear in Engels that what's going on is simply using those dial-ups as a portal to the Internet. The other problem that infected everything the Board did in the Facebook case is its reliance on the predictable results idea. What happened in a case where it's difficult to think about what the result might be, and Facebook never mentioned it, and the Board never mentioned it, as a matter of fact, the predictable result idea was injected not even as a one-liner, but a half-liner by Facebook in the petition with no evidence, no explanation, and no support. And yet the Board's conclusion is driven heavily, if not exclusively, by this predictable result idea. And where we end up when that occurs, when that concept is used as it was, is with the burden of proof being placed on the patent owner. That's what we see throughout the Board's analysis. Patent owner didn't prove. Patent owner didn't persuade. So they take the half-line comment by Facebook that only a predictable result would apply. They say that BE didn't rebut that, and that's enough. They take features that aren't useful, that the expert testimony shows aren't useful, and they combine them. This is an example of classic hindsight, and it's nothing more. Thank you. Thank you, counsel. We'll take the case under review.